J-S08024-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DERRICK JEROME BENNETT, JR. | : | |
| | : | |
| Appellant | : | No. 1906 EDA 2024 |

Appeal from the Judgment of Sentence Entered February 21, 2024
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s): CP-46-CR-0000594-2023

BEFORE: DUBOW, J., KUNSELMAN, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY KUNSELMAN, J.: **FILED MAY 15, 2025**

Derrick Jerome Bennett, Jr. appeals from the judgment of sentence entered after a jury found him guilty of persons not to possess firearms, driving under the influence (DUI), and other crimes.[1] He challenges the denial of his motion to suppress evidence, the weight of the evidence, and the discretionary aspects of his sentence. We affirm.

Police charged Bennett with the above crimes following a traffic stop on January 6, 2021. The charges were held for court.

Before trial, Bennett moved to suppress evidence, arguing *inter alia* that the police stopped him illegally. On October 18, 2023, the trial court held a

_____

[1] 18 Pa.C.S. §§ 6105(a)(1) (possession of firearm prohibited) and 6106(a)(1) (firearms not to be carried without a license), 35 P.S. § 780-113(a)(16) (possession of a controlled substance) and (a)(32) (paraphernalia), and 75 Pa.C.S. §§ 3802(d)(2) (DUI of a controlled substance), 3313(d)(1) (driving in right lane), 4581(a)(2)(ii) (seat belt), 1543(b)(1)(i) (driving under suspension, DUI-related), and 1501(a) (driving without a license).

suppression hearing. The Commonwealth presented the testimony of Trooper Sean Fay, as well as video footage from the troopers' dashboard camera.

After the suppression hearing and briefing, the trial court entered the following findings of fact:

1. On or about January 6, 2021 at approximately 8:28 p.m., Pennsylvania State Police Troopers Sean Fay and Justin Howell were on patrol in the area of Lower Merion Township, Montgomery County, Pennsylvania.

* * *

4. On January 6, 2021, Trooper Fay and Trooper Howell were in uniform in a marked patrol vehicle. Trooper Howell was operating the patrol vehicle while Trooper Fay was riding as a passenger.

5. The troopers' patrol vehicle was equipped with [a working dashboard camera and a] working microphone. Trooper Fay was wearing the microphone.

6. This incident occurred during the COVID-19 pandemic, during which it was commonplace and advisable to wear a mask to prevent the spread of COVID-19. Both troopers were wearing face masks at this time, as required by the Pennsylvania State Police.

7. The troopers were on patrol on Interstate 76 (Schuylkill Expressway) Westbound, stationed on or near the ramp where Route 1 South leads onto 76 West. While Troopers Fay and Howell were on stationary patrol, they observed a white 2020 Nissan bearing Pennsylvania registration . . . . The troopers ran the registration of the Nissan and learned that it was a rental car.

8. The Nissan continued onto 76 West from Route 1 South, entering the highway in the left lane (the entrance to 76 West from Route 1 South is on the left; therefore, vehicles entering the highway proceed directly into the left lane). 76 West is a two-lane highway.

9. The troopers entered the flow of traffic proceeding onto 76 West.

10. The troopers testified that when they entered onto 76 West the Nissan was ahead of them, and it took a while for them to see it again.

11. When the troopers observed the Nissan [again] on 76 West, it was still travelling in the left lane. The Nissan was not passing traffic, and there was no traffic present in the right lane to prevent it from traveling into the right lane. The right lane was open and available. There was one visible vehicle traveling in the right lane, but that vehicle was a distance ahead of the Nissan and appeared to be traveling faster than the Nissan, such that it was gaining distance from the Nissan. There was a vehicle traveling directly behind the Nissan in the left lane, and the Nissan did not move to the right lane to let it pass.

12. The troopers noted the Nissan was travelling at or below the speed limit in the left lane.

13. The troopers moved into the right lane to pass the vehicle travelling directly behind the Nissan. Once they did, they moved back into the left lane directly behind the Nissan.

14. [Based on an apparent violation of the Vehicle Code, 75 Pa.C.S. § 3313(d)(1) (driving in right lane),] Trooper Fay asked Trooper Howell to activate the emergency lights and conduct a traffic stop of the Nissan. They needed to find a safe shoulder to initiate the stop for safety reasons.

15. The troopers conducted the traffic stop on I-76 westbound between mile marker 336 and 335 (the mile markers go in descending order westbound). The Nissan safely pulled to the right shoulder. The entrance where the Nissan entered 76 west was at or around mile marker 339. The Nissan had remained in the left lane for approximately four (4) miles past the location the troopers first saw the Nissan enter 76 West.

Findings of Fact and Conclusions of Law, 11/9/23, at 1–4. The court also found Trooper Fay to be credible and worthy of belief. *Id.* at 16.

The trial court denied Bennett's motion to suppress, reasoning that the troopers had probable cause to stop the Nissan.

The case proceeded to a jury trial from November 29 to December 1, 2023. Trooper Fay testified that when he approached the car, he smelled marijuana "almost instantaneously" through his mask. Bennett was the driver, the front-seat passenger was Cynthia Santiago, and the passenger in the rear was Naseer Burgess. Bennett told Trooper Fay that there was a roach in the car, meaning the butt of a hand-rolled marijuana cigar. Santiago said they were smoking marijuana prior to being in the car. Santiago also stated that there was a firearm in the car. Trooper Fay detained the three occupants of the car for further investigation.

Trooper Fay testified that police seized the Nissan and conducted a search pursuant to a warrant. The car contained a Glock 19 under the driver's seat, as well as another firearm and other items. The serial numbers to the Glock 19 were partially filed off.

Santiago testified that she purchased the Glock 19 for Bennett on November 27, 2020; Bennett paid for the gun. Bennett sent her a text message that day: "Thanks baby love u"; Santiago explained he was thanking her for purchasing the gun. The next day, Bennett texted: "In ima need u to take me to the jets to get my [--] in then we going back to your house" "Cause I need to get these numbers off dis jawn before I run around wit it bae"; Santiago testified that Bennett was referring to serial numbers on the gun.

On December 1, 2020, Santiago texted Bennett about the gun that was then in his possession: "Did u get them numbers off?" He replied: "Fr [for real] cynn" "It up till get off I'm not stupid." Santiago explained to the jury

her concern that the gun was purchased in her name. On December 3, 2020, Santiago sent Bennett a picture of someone removing the serial number from the gun. Santiago testified that after she purchased the gun, Bennett had possession of it.

Santiago testified that on January 6, 2021, Bennett had the gun in his waist when they left her apartment in her rental car with Naseer Burgess. When the police pulled them over, the gun was between Bennett's side and the center console.

Santiago acknowledged that she cooperated with the Commonwealth and entered an open guilty plea related to the incident. Bennett extensively cross-examined Santiago about her inconsistent statements in a prior police interview, suggesting that Burgess had thrown the gun under the driver's seat. However, Trooper Fay testified in rebuttal that it is common for individuals not to tell the full truth in interviews. He clarified that the Glock 19 had been placed in a neat and orderly manner under the driver's seat.

Taylor Richart, a forensic DNA analyst, testified about DNA samples that were taken from the Glock 19, its magazine, and ammunition. Based on her expertise, she opined that DNA on the gun came from a mixture of four contributors. Contributor 1 was 83 percent of the mixture, which was consistent with a DNA sample from Bennett. Richart provided a similar expert opinion for the DNA from the magazine and ammunition: 80 percent of the mixture was consistent with Bennett. Richart explained how DNA can be transferred by touch. She acknowledged on cross-examination, however, that

she could not determine where, when, or how Bennett's DNA was left on the gun.

The jury found Bennett guilty of all charges.

Bennett appeared for sentencing on February 21, 2024. Bennett exercised his right of allocution, addressing his mental health issues, his stress from family tragedy, his good parole record, and his remorse for his actions. The trial court stated that it considered a pre-sentence investigation report, as well as Bennett's statements in allocution. The court sentenced Bennett to 7 to 15 years of imprisonment for the firearm offense at Count 1. For DUI, the court sentenced Bennett to 1 to 2 years of imprisonment concurrent, as well as a mandatory fine.

On March 1, 2024, Bennett filed post-sentence motions, including a motion for a new trial because the verdicts were against the weight of the evidence. The trial court denied Bennett's motions on June 18, 2024.

Bennett timely appealed. Bennett and the trial court complied with Pennsylvania Rule of Appellate Procedure 1925.

Bennett presents three issues for review:

1. Whether the Trial Court erred in denying [Bennett's] Motion to Suppress Physical Evidence.

2. Whether the verdicts of guilty were against the weight of the evidence.

3. Whether [Bennett's] sentence was unduly harsh, excessive, unreasonable, an abuse of discretion and contrary to the fundamental norms of the sentencing guidelines.

Bennett's Brief at 7–8.

Bennett first argues that the trial court erred in denying his motion to suppress evidence. He contends that any violation of the Vehicle Code was "momentary and minor," such that the Troopers lacked probable cause or reasonable suspicion to stop him.

When this Court reviews a suppression ruling, we determine "whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct." *Commonwealth v. Rivera*, 316 A.3d 1026, 1031 (Pa. Super. 2024) (citation omitted). Our scope of review of a suppression issue is limited to the suppression hearing record, considering the evidence of the prevailing party (here, the Commonwealth), and any uncontradicted evidence presented by the defendant. *Id.*

Generally, a stop for a violation of the Vehicle Code requires probable cause if "the driver's detention cannot serve an investigatory purpose relevant to the suspected violation." *Commonwealth v. Feczko*, 10 A.3d 1285, 1291 (Pa. Super. 2010) (*en banc*). To meet this standard, an "officer must be able to articulate specific facts possessed by him at the time of the questioned stop, which would provide probable cause to believe that the vehicle or the driver was in some violation of some provision of the Vehicle Code." *Commonwealth v. Lindblom*, 854 A.2d 604, 607 (Pa. Super. 2004). An officer has authority to stop a vehicle even for "minor" offenses included in the Vehicle Code. *Commonwealth v. Bozeman*, 205 A.3d 1264, 1273–74

(Pa. Super. 2019) (citing **Commonwealth v. Harris**, 176 A.3d 1009, 1019 (Pa. Super. 2017)).

Notably, however, a driver's "momentary and minor" departure from a travel lane does not provide probable cause to support a traffic stop. **Commonwealth v. Garcia**, 859 A.2d 820, 823 (Pa. Super. 2004). Under this test, there is no probable cause to stop a driver who crosses the berm line for a second or two. **Id.** (citing **Commonwealth v. Gleason**, 785 A.2d 983 (Pa. 2001)). By contrast, an officer may stop a driver who weaves within his lane and crosses the center line four or five times. **Id.** (citing **Lindblom**, 854 A.2d at 608).

Here, the Vehicle Code provision at issue generally requires a driver to use the right-hand lane of a highway, with four exceptions:

> (1) Except as provided in paragraph (2) [not at issue here] and unless otherwise posted, upon all limited access highways having two or more lanes for traffic moving in the same direction, all vehicles shall be driven in the right-hand lanes when available for traffic except when any of the following conditions exist:
>
>> (i) When overtaking and passing another vehicle proceeding in the same direction.
>>
>> (ii) When traveling at a speed greater than the traffic flow.
>>
>> (iii) When moving left to allow traffic to merge.
>>
>> (iv) When preparing for a left turn at an intersection, exit or into a private road or driveway when such left turn is legally permitted.

75 Pa.C.S. § 3313(d)(1).

The trial court found that the troopers observed Bennett violate Section 3313(d)(1). The record, including Trooper Frye's testimony and the video

from the dashboard camera, supports this finding. Bennett did not pass a vehicle in the right lane, travel faster than the traffic flow, allow traffic to merge from the right, or prepare for a legal left turn. Bennett's continuous travel in the left lane for approximately four miles was not "momentary" like the one- or two-second line crossings in *Garcia*. Therefore, the troopers had probable cause to stop Bennett, and the trial court properly denied Bennett's motion to suppress. Bennett's first issue fails.

Second, Bennett challenges the trial court's denial of his motion for a new trial. He claims his firearm conviction was against the weight of the evidence. He alleges a pair of deficiencies in the Commonwealth's case. Although the Commonwealth's DNA expert concluded that Bennett contributed to the DNA mixture on the gun, she could not say how, where, or when Bennett's DNA appeared on the gun. And there was reason to disbelieve Cynthia Santiago: although she testified that she purchased the gun for Bennett, she previously told police that the gun was hers.

An appellate court's task on appeal of the denial of a motion for a new trial "is to review the trial court's exercise of discretion based upon a review of the record, rather than to consider *de novo* the underlying question of the weight of the evidence." *Commonwealth v. Rivera*, 983 A.2d 1211, 1225 (Pa. 2009). A trial court's inquiry is whether, in light of the evidence at trial, the verdict shocked its conscience:

> In order to grant a new trial on the grounds that the verdict is against the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the

conscience of the court. A verdict shocks the judicial conscience when the figure of Justice totters on her pedestal, or when the jury's verdict, at the time of its rendition, causes the trial judge to lose his breath, temporarily, and causes him to almost fall from the bench.

***Commonwealth v. Akhmedov***, 216 A.3d 307 (Pa. Super. 2019) (brackets, quotation marks, and citations omitted). A reviewing court, in turn, must determine whether the trial court abused its discretion in concluding that the verdict did not shock the trial court's conscience. ***Commonwealth v. Rogers***, 259 A.3d 539, 541 (Pa. Super. 2021). It is an appellant's obligation to show an abuse of discretion, *i.e.*, "how the trial court's ruling overrode the law, was manifestly unreasonable, or the product of bias, prejudice, ill-will or partiality." ***Id.*** (drawing from ***Commonwealth v. Santos***, 176 A.3d 877, 882 (Pa. Super. 2017)).

Here, the trial court explained its rejection of Bennett's weight claim:

> Regarding [Bennett's] claim that Ms. Santiago is a biased witness, in its closing charge to the jury, the court charged the jury on credibility. The court explained to the jury that they "must judge the truthfulness and accuracy of each witness's testimony and decide whether to believe all or part or none of that testimony." One of the factors to consider when judging the credibility of witnesses is whether the witness had any interest in the outcome of the case: any bias, prejudice, or other motive that might affect their testimony. The court defined "accomplice" and [provided a proper "corrupt and polluted source" instruction to the jury].

> The court also instructed the jury specifically on Cynthia Santiago's inconsistent statements and how to judge the credibility and weight of her testimony.

> The jury chose to believe the testimony of Cynthia Santiago that she purchased the firearm for [Bennett]. Her testimony consisted of her own statements and [the] text message conversation between her and [Bennett] related to the obliteration

- 10 -

of the serial number on the firearm and [Bennett's] possession and control of the firearm. The jury chose to believe her testimony despite some inconsistencies.

Contrary to [Bennett's] assertion, the DNA detected on the firearm was probative. The jury evaluated the expert testimony presented related to DNA found on the firearm, and that [Bennett] was the majority contributor of that DNA. At trial, [Bennett] advanced a theory that his DNA was transferred to the firearm from Ms. Santiago. The jury was free to reject this theory and find the firearm was in [Bennett's] possession and control. The DNA testimony corroborated Ms. Santiago's testimony that the firearm belonged to [Bennett].

\* \* \*

[Bennett] did not present any evidence at trial. Each Commonwealth witness was effectively cross examined. The evidence in this case was not tenuous, vague or uncertain. The jury's verdict of guilty on these charges was not shocking.

Trial Court Opinion, 9/13/24, at 33–36 (record citations omitted).

Upon review, we discern no abuse of discretion. The trial court, after observing the testimony at trial, determined that the jury's verdict did not shock its conscience. Bennett recalls inconsistent evidence from trial but does not demonstrate how the trial court's ruling was an abuse of discretion. Bennett's second issue fails.

Third, Bennett challenges the discretionary aspects of his sentence. As a threshold matter, he petitions for allowance of appeal, alleging his sentence was excessive in combination with the trial court's failure to consider different mitigating factors. On the merits, Bennett recounts his allocution to the trial court, where he described his mental health issues, tragic family background, successful performance on parole, and remorse for his actions. Based on the

trial court's alleged failure to consider these factors, Bennett argues that his "sentence above the standard range of the guidelines was excessive."

By statute, this Court has discretion to grant allowance of appeal for a challenge to the discretionary aspects of a sentence. 42 Pa.C.S. § 9781(b). We determine whether an appellant has invoked our jurisdiction by satisfying four requirements:

> (1) whether the appellant filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. 720; (3) whether the appellant's brief has a fatal defect, *see* Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

*Commonwealth v. Bartic*, 303 A.2d 124, 134 (Pa. Super. 2023) (quoting *Commonwealth v. Moury*, 992 A.2d 162, 170 (Pa. Super. 2010)) (brackets omitted). Notably, "an excessive sentence claim—in conjunction with an assertion that the court failed to consider mitigating factors" presents a substantial question for purposes of subsection 9781(b). *Commonwealth v. Miller*, 275 A.3d 530, 534 (Pa. Super. 2022) (quoting *Commonwealth v. Raven*, 97 A.3d 1244, 1253 (Pa. Super. 2014)).

Here, Bennett has properly presented his issue by filing a timely appeal, preserving his issue, and including a Rule 2119(f) statement in his brief. Furthermore, Bennett's claim raises a substantial question. *See id.* We thus proceed to the merits.

On the merits of a discretionary sentencing claim, this Court reviews for an abuse of discretion. **Commonwealth v. Taylor**, 277 A.3d 577, 592–93 (Pa. Super. 2022).

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

**Id.** (quoting **Commonwealth v. Hyland**, 875 A.2d 1175, 1184 (Pa. Super. 2005)). In conducting this review, we must affirm a sentence unless we find one of three scenarios prescribed by statute:

> (1) the sentencing court purported to sentence within the sentencing guidelines but applied the guidelines erroneously;
>
> (2) the sentencing court sentenced within the sentencing guidelines but the case involves circumstances where the application of the guidelines would be clearly unreasonable; or
>
> (3) the sentencing court sentenced outside the sentencing guidelines and the sentence is unreasonable.

42 Pa.C.S. § 9781(c).

Here, contrary to Bennett's assertion, the trial court imposed a sentence that was within the sentencing guidelines. For the firearm offense, Bennett's minimum term of seven years (84 months) of imprisonment was within the standard range of 72 to 90 months. Furthermore, the trial court stated that it considered Bennett's statements in allocution and his presentence investigation report. Bennett does not show how the trial court abused its

- 13 -

discretion or how the application of the guidelines was clearly unreasonable in his case. Bennett's third issue fails.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/15/2025